**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

—————————————————————————————

| | | |
|---|---|---|
| MOHAMAD IBRAHIM SHNEWER, | : | |
| | : | |
| Petitioner, | : | Civ. No. 13-3769 (RBK) |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | **OPINION** |
| | : | |
| Respondent. | : | |

—————————————————————————————

**ROBERT B. KUGLER, U.S.D.J.**

**I.      INTRODCUTION**

Petitioner, Mohamad Ibrahim Shnewer, seeks relief under 28 U.S.C. § 2255 from his

federal conviction and sentence. Mr. Shnewer filed his § 2255 motion and his reply brief in

support *pro se*. However, Mr. Shnewer now has counsel representing him. Mr. Shnewer was

convicted after a jury trial (along with his coconspirators Dritan Duka, Shain Duka, Eljvir Duka

(collectively the "Duka brothers") and Serdar Tatar) of conspiracy to murder members of the

United States military. Mr. Shnewer raises several claims in his § 2255 motion; specifically:  (1)

ineffective assistance of counsel by failing to object to the sentencing court's failure to give

meaningful consideration to the need to avoid unwarranted sentencing disparities ("Claim I"); (2)

ineffective assistance of counsel in failing to raise the sentencing court's impermissible use of

religious beliefs to sentence him as well as a direct claim that this Court used his religion to

determine his sentence ("Claim II"); (3) ineffective assistance of counsel for failing to

communicate a plea offer to him or pursue plea discussions with the government ("Claim III");

and (4) all claims raised by his codefendants in their separate § 2255 motions ("Claim IV"). The

respondent opposes the § 2255 motion. Mr. Shnewer then filed a reply brief along with an

accompanying memorandum of law. Respondent then was permitted to file a sur-reply brief in response to Mr. Shnewer's reply brief and memorandum of law. For the following reasons, the Court will deny relief on all of the claims Mr. Shnewer raises in his § 2255 motion.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Shnewer, the Duka brothers, and Tatar are a group of young men who lived in New Jersey and developed an interest in violent jihad, particularly attacks against the United States military. Defendants, who had known each other since high school, came to the FBI's attention after it received a copy of a video that was brought to a Circuit City store in Mt. Laurel, New Jersey for copying. The video dated from January 2006 and depicted the five defendants and others at a firing range in the Pocono Mountains, shooting weapons and shouting "Allah Akbar!" and "jihad in the States."

Over the course of the next sixteen months, the FBI deployed two cooperating witnesses, Mahmoud Omar and Besnik Bakalli, to monitor defendants' activities. The evidence presented at trial showed that, between January 2006 and May 2007, defendants viewed and shared videos of violent jihadist activities, including beheadings, around the world; they viewed and shared videos of lectures advocating violent jihad against non-Muslims; they sought to acquire numerous weapons, including automatic firearms and rocket-propelled grenades; they returned to the Poconos, where they again engaged in shooting practice; they discussed plans to attack the United States military; they conducted research and surveillance on various potential targets for such an attack in New Jersey, Pennsylvania, and Delaware; and they procured a map of the United States Army Base at Fort Dix to use in planning and coordinating such an attack.

With respect to the individual defendants, the evidence demonstrated the following:

Mohamad Shnewer is a naturalized American citizen who was born in Jordan. He admired and sought to emulate the "nineteen brothers," i.e., the September 11 hijackers, Osama bin Laden, and the leader of Al Qaeda in Iraq, Abu Musab al-Zarqawi. Shnewer openly discussed and planned attacks on military targets in New Jersey, Pennsylvania, and Delaware. Along with Omar, the government informant, he staked out the United States Army Base at Fort Dix, McGuire Air Force Base, Lakehurst Naval Air Station, and the United States Army Base at Fort Monmouth in New

Jersey; the United States Coast Guard Base in Philadelphia, Pennsylvania; and Dover Air Force Base in Delaware. Shnewer also considered attacking the federal government building at 6th and Arch Streets in Philadelphia and drove by the building to determine whether such an attack would be feasible. To accomplish an attack on these targets, Shnewer proposed deploying a gas tanker truck as a bomb, using roadside bombs or surface-to-air missiles, and spraying military targets with machinegun fire. He sought to acquire AK-47 machineguns from Omar to use in such an attack.

Dritan, Shain, and Eljvir Duka are brothers who were born in Albania. During the events that were the subject of the trial, they were in the United States illegally. In 2006 and 2007, the Dukas took at least two trips to the Poconos to train for jihad by firing weapons, attempting to buy automatic weapons, discussing jihad, and watching violent jihadist videos. The Dukas befriended government informant Bakalli, a fellow Albanian, and encouraged him to join them in avenging Muslims who had been oppressed in the United States and Israel. They viewed and praised a lecture, *Constants on the Path to Jihad*, by Anwar al-Awlaki, the prominent cleric and proponent of attacks against the United States military, and videos depicting attacks on American soldiers by violent jihadists in Iraq and elsewhere. In recorded conversations presented at trial, the Dukas described beheadings depicted in the videos as just punishment for traitors. The Dukas watched the beheading videos over and over again until they became inured to the spectacle.  Dritan told Bakalli that, although at first he "couldn't take it," "[n]ow I see it and it's nothing, I do not care. I saw hundreds being beheaded."  Similarly, Eljvir told Bakalli that the beheadings were difficult to watch at first, but that "[n]ow we can watch it no problem."

Like Shnewer, the Dukas sought to acquire firearms to further their plans. They could not acquire weapons lawfully because they were in the country illegally, so they turned to the black market. By January 2007, the three brothers told Bakalli they had acquired a shotgun, two semi-automatic rifles, and a pistol, and they continued to look for opportunities to buy machineguns.

Later that spring, Dritan Duka ordered nine fully automatic weapons – AK 47s and M-16s – from a contact of Omar in Baltimore. The FBI arranged a controlled transaction, and, on May 7, 2007, Dritan and Shain Duka went to Omar's apartment to retrieve their weapons. After handing Omar $1,400 in cash, Dritan and Shain examined and handled four fully automatic machineguns

and three semiautomatic assault rifles. They asked Omar for garbage bags to conceal the weapons (so they would look like golf clubs) as they carried them out to the car. Before they could get there, however, federal and state law enforcement officers entered Omar's apartment and arrested them. The entire transaction was captured on video by equipment installed in Omar's apartment by the FBI and was shown to the jury at trial.

Serdar Tatar is a lawful permanent resident in the United States who was born in Turkey. Tatar appears in the video of defendants' January 2006 training trip to the Poconos. After extensive discussions with Omar about Shnewer's plan to attack Fort Dix, Tatar agreed to help by providing Omar with a map of Fort Dix to use in planning such an attack. Regarding the overall plan to attack Fort Dix, Tatar told Omar in a recorded conversation, "I'm in, honestly, I'm in."

All five defendants were arrested on May 7, 2007, after Dritan and Shain Duka completed the controlled firearm purchase from Omar.

*United States v. Duka*, 671 F.3d 329, 333-35 (3d Cir. 2011).

Relevant to this Opinion, Mr. Shnewer was charged with one count of conspiracy to murder members of the United States military in violation of 18 U.S.C. § 1117 ("Count 1") and one count of attempt to murder members of the United States military in violation of 18 U.S.C. § 1114 ("Count 2"). Mr. Shnewer was also charged with one count of attempted possession of firearms in furtherance of a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A) & (B)(ii). ("Count 4").[1] Mr. Shnewer was found guilty of Count 1 of conspiracy to kill United States military personnel and Count 4 of attempted possession of firearms in furtherance of a crime of violence. However, Mr. Shnewer, along with his codefendants, were found not guilty of Count 2 of attempting to kill United States military personnel. This Court sentenced Mr.

---

[1] The Duka brothers and Mr. Tatar were also charged in Count 1 and 2. Additionally, the superceding indictment charged the Duka brothers with possession and attempted possession of firearms in furtherance of a crime of violence ("Count 3") and possession of firearms by an illegal alien ("Count 7"). Shain and Dritan Duka were also charged with possession of machine guns ("Count 5") and possession of firearms by an illegal alien ("Count 6").

Shnewer to life imprisonment on Count 1 and 360 months to be served consecutively on Count 4.

On appeal, the government conceded that it would not defend Mr. Shnewer's conviction on Count 4 because it charged Mr. Shnewer with the non-existent crime of attempted possession of firearms in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). *See Duka*, 671 F.3d at 353. Thus, the Third Circuit reversed Mr. Shnewer's conviction on Count 4. On remand, Mr. Shnewer was resentenced to life imprisonment on his remaining conviction on Count 1.

## III. LEGAL STANDARD FOR § 2255 MOTION

A motion to vacate, set aside or correct a sentence of a person in federal custody pursuant to 28 U.S.C. § 2255 entitles a prisoner to relief if "the court finds ... [t]here has been such a denial or infringement of the constitutional rights of the prisoner as to render judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). "In considering a motion to vacate a defendant's sentence, 'the court must accept the truth of the movant's factual allegations unless they are clearly frivolous based on the existing record.'" *United States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005) (quoting *Gov't of Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir. 1989)) (also citing R. Governing § 2255 Cases R. 4(b)). A District Court "is required to hold an evidentiary hearing 'unless the motion and files and records of the case show conclusively that the movant is not entitled to relief.'" *Id.* (quoting *Forte,* 865 F.2d at 62). The Third Circuit has stated that this standard creates a "'reasonably low threshold for habeas petitioners to meet.'" *Id.* (quoting *United States v. McCoy,* 410 F.3d 124, 134 (3d Cir. 2005) (quoting *Phillips v. Woodford,* 267 F.3d 966, 973 (9th Cir. 2001))). Accordingly, this Court abuses its discretion "if

it fails to hold an evidentiary hearing when the files and records of the case are inconclusive as to whether the movant is entitled to relief." *Id.* (citing *McCoy,* 410 F.3d at 134).

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD

Mr. Shnewer's claims involve whether counsel was ineffective at trial/sentencing and/or on appeal. The Sixth Amendment guarantees effective assistance of counsel. In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated the two-prong test for demonstrating when counsel is deemed ineffective. First, the petitioner must show that considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett,* 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim in light of all of the circumstances) (citation omitted). A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland,* 466 U.S. at 690. Under this first prong of the *Strickland* test, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax,* 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland,* 466 U.S. at 690–91). If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that

reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn,* 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland,* 466 U.S. at 690–91).

The second prong of the *Strickland* test requires the petitioner to affirmatively prove prejudice. *See* 466 U.S at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale,* 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. 86, 111–12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed.'" *Rainey v. Varner,* 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland,* 466 U.S. at 697). Additionally, "claims of ineffective assistance of appellate counsel are also governed by the *Strickland* standard." *Lusick v. Palakovich,* 270 F. App'x 108, 110 (3d Cir. 2008) (citing *United States v. Mannino,* 212 F.3d 835, 840 (3d Cir. 2000)).

## V.    DISCUSSION

A.  Claim I – Failure to Object to Sentencing Disparities

In Claim I, Mr. Shnewer makes two distinct arguments. First, he argues that his trial counsel, Rocco C. Cipparone, Jr., Esq., was ineffective because he failed to object when this Court purportedly did not give proper consideration at sentencing to the need to avoid unwarranted sentencing disparities when it sentenced him to life imprisonment. Second, Mr. Shnewer asserts that Mr. Cipparone was ineffective because he failed to advance a colorable argument at sentencing that a life sentence constituted an unwarranted disparate sentence. Thus, in the first argument, Mr. Shnewer is arguing that Mr. Cipparone should have objected to this Court's discussion of the 18 U.S.C. § 3553(a) factors based on the arguments presented. In the second argument, Mr. Shnewer asserts that Mr. Cipparone should have presented better arguments on the § 3553(a) factors (specifically § 3553(a)(6)). Each of these arguments is considered in turn.

i.    *Failure to Object to Sentencing Court's Failure to Consider Need to Avoid Unwarranted Sentencing Disparities*

Mr. Shnewer's first argument is that Mr. Cipparone failed to object when this Court purportedly did not consider the need to avoid unwarranted sentence disparities among defendants with similar records. At sentencing:

> A district court must begin the process by first calculating the applicable Guidelines range. After that initial calculation, the court must then rule on any motions for departure and, if a motion is granted, state how the departure affects the Guidelines calculation. Finally, after allowing the parties an opportunity for argument, the court must consider all of the § 3553(a) factors and determine the appropriate sentence to impose, which may vary from the sentencing range called for by the Guidelines.

*United States v. Levinson*, 543 F.3d 190, 194-95 (3d Cir. 2008) (citations omitted). It is this third-step of this process that Mr. Shnewer argues that Mr. Cipparone's counsel amounted to ineffective assistance.

Section 3553(a) of Title 18 of the United States Code states as follows:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for--
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--
> (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
> (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
> (B) in the case of a violation of probation or supervised release, the applicable guidelines or

policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement--
   (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
   (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In [*United States v.*] *Booker*[, 543 U.S. 220 (2005)], the Supreme Court held that appellate courts should insure that district courts analyze the § 3553(a) factors when determining sentences for criminal enterprises. 543 U.S. at 261, 125 S. Ct. 738. Sentencing courts must give "meaningful consideration" to the factors in 18 U.S.C. § 3553(a). *United States v. Olhovsky,* 562 F.3d 530, 546 (3d Cir. 2009). A district court's fail[ure] to consider the § 3553(a) factors can create a procedurally unreasonable sentence. *United States v. Levinson,* 543 F.3d 190, 196 (3d Cir. 2008).

"[T]he district court need not discuss and make findings as to each of the § 3553(a) factors if the record makes clear that the court took the factors into account in sentencing...." *United States v. Kononchuk,* 485 F.3d 199, 204 (3d Cir. 2007). Still, "[w]here one party raises a colorable argument about the applicability of one of the factors, [ ] the court should respond to that argument as part of its 'meaningful consideration of the relevant statutory factors and

the exercise of independent judgment.' " *United States v. Merced,*
603 F.3d 203, 221 (3d Cir. 2010) (quoting [*United States v.*] *Grier,*
475 F.3d [556,] 571–72 [3d Cir. 2007))].

*United States v. Friedman*, 658 F.3d 342, 362 (3d Cir. 2011). This Court discussed the § 3553(a)

factors as follows at Mr. Shnewer's sentencing hearing:

> So I turn now to the factors under 3553. The first and most
> important in all these cases is the nature and circumstances of the
> offense, and the history and characteristics of the defendant.
>
> As has been mentioned he has no criminal record whatsoever. He
> has four violations at FDC Philadelphia for refusing to obey an
> order and possessing an unauthorized item and destroying
> property, which are not terribly significant.
>
> He was born in Jordan, lived in Cherry Hill; interesting, interesting
> family history. His father was arrested in Palestine twice by the
> Israelis. Claims that Israel wanted him to spy on his fellow
> Muslims, which he refused. He relocated to Jordan and the
> Jordanian officials thought he was an Israeli spy.
>
> Moved to Saudi Arabia and eventually came to the United States,
> settled in Philadelphia and moved to Cherry Hill in 1996.
>
> Mr. Shnewer became a naturalized U.S. citizen in 2004. We know
> it's a family – and these are all so tragic and so sad. The
> destruction of these families because of what these young men
> have done.
>
> One of his sisters is married to one of the Dukas. He's single, has
> no children. No drug or alcohol use or abuse. Graduated from
> Cherry Hill High School West, was a fair student; has some
> college at Camden County College.
>
> He has a cab driver's license, worked as a cab driver; worked at the
> food market; worked as a waiter at a restaurant in Marlton; worked
> for Cingular and Verizon; on a whole a fairly positive life to this
> point.
>
> But then we turn to the nature of the offense, and the Government
> is correct, he was the epicenter of this conspiracy. He's the one
> who chose Fort Dix, he emphasized how easy this attack would be;
> because Sadam [sic] knows it like the back of his hand.

Dreamed of killing Jews, and that's not the only reference in the tapes. He did not have kind words for Jewish people.

He did the surveillances. And some of the things he said are just horrifying. He's very clear about the reasons why they wanted to kill American soldiers, and destroy American buildings.

Eliminate any feeling that they have achieved anything with this war on terror. Talked about attacking the national guard armory in Cherry Hill, killing them all and taking the weapons they need. And the videos, my gosh, the videos, just awful stuff. And he seemed the [sic] revel in that stuff.

He says today he can't believe he said some of these things because he couldn't consider taking another person's life. All he talked about – this wasn't a one-time incident; all he talked about was killing people, how best to do that, how to destroy things. And why it was important to kill and destroy.

And I agree with his family, he's an entirely different person that they seemed to know, but that's who he is. And that's what he did.

There's no question in my mind he was motivated by hatred of Jews and Americans. He desired to kill, he agreed to kill, he planned to kill.

This is a very serious crime. As I have stated repeatedly, it's the most serious crime I can imagine under the guidelines. It's clear the Commission wanted to punish this crime severely.

In order to promote respect for the law as to deterrence, I hear what he says; of course I hear every defendant tell me they'll never commit another crime.

And I also heard the months after months of tapes. Which indicates to me that he is so deeply committed to this ideology and this desire to kill that he can't be rehabilitated.

The public needs to be protected from him, because he will commit other crimes if given a chance.

*I have reviewed the sentences that are available; obviously we spent a lot of time talking about the guidelines, and the policy statements in the guidelines. The sentence disparity is really not an issue in this case*. Restitution as I have said will be ordered. I am

> left with a firm conclusion as difficult as it is that only a sentence
> of life is sufficient to accomplish the goals of the law.

(Shnewer Sentencing Tr. at p. 48-51 (emphasis added)) Mr. Shnewer takes exception with the

emphasized portion of the sentencing transcript and argues as follows:

> The sole reference to the § 3553(a)(6) factor by the sentencing
> court in this case was this brief comment: "The sentence disparity
> is really not an issue in this case." As noted, although a district
> court need not state or even address all the § 3553(a) factors, that is
> true only "as long as the record makes clear that the factors have
> been considered[.]" In this case, there is nothing in the record to
> suggest that the court considered § 3553(a)(6) beyond that brief
> comment, rendering it tantamount to a rote reference that was
> simply insufficient to demonstrate that the court "reasonably
> discharged its obligation" to give meaningful consideration to that
> factor.

(Dkt. No. 13 at p. 4)

Mr. Shnewer is not entitled to relief based on this argument. This Court made clear at Mr.

Shnewer's sentencing hearing that it took the § 3553(a) factors into account at sentencing. *See*

*Friedman*, 658 F.3d at 362 (stating district court need not discuss and make findings as to each

of the § 3553(a) factors as long as record makes clear factors were taken into account at

sentencing). Furthermore, this was not a case where Mr. Cipparone made a colorable argument

about § 3553(a)(6) that would have triggered this Court to specifically address it at sentencing.

*See Friedman*, 658 F.3d at 362 (noting that court should respond to party's argument on one of

the § 3553(a) factors when party makes a *colorable* argument). Indeed, Mr. Cipparone's

argument in his presentence brief with respect to § 3553(a)(6) stated in conclusory fashion that a

downward variance from the advisory guidelines range would not create an unwarranted

sentencing disparity. However, at no time did Mr. Cipparone make a colorable argument with

respect to the need to prevent unwarranted sentencing disparities that required this Court's specific express attention.[2]

Additionally, it is worth noting that Mr. Shnewer received a life sentence, which was within the advisory Sentencing Guidelines exclusive range. "[W]ithin-guidelines sentences . . . generally do not lead to disparities requiring that a defendant be granted relief because 'avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges.'" *United States v. Kluger*, 722 F.3d 549, 568-69 (3d Cir. 2013) (quoting *Gall v. United States*, 552 U.S. 38, 54 (2007)).

Mr. Shnewer's conviction on Count 1 was for any term of years with a maximum of life imprisonment. *See* 18 U.S.C. § 1117. Furthermore, Mr. Shnewer had a total offense level of 51 and a criminal history category of VI. This placed Mr. Shnewer at an "off-of-the-chart" advisory guidelines range of exclusively life imprisonment (the sentencing table only goes up to offense level 43). Thus, Mr. Shnewer's life sentence was within the applicable advisory guidelines range. As noted above, this within guidelines sentence does not generally lead to sentencing disparities. *See Kluger*, 722 F.3d at 568-69.

---

[2] At one point during Mr. Shnewer's sentencing hearing, Mr. Cipparone alluded to a sentence in another case where an individual robbed five banks and a liquor store, discharged a gun at one of them and had a prior conviction of stabbing someone in the chest. He also smuggled out a razor blade after his arrest and tried to sexually assault his court appointed lawyer according to Mr. Cipparone. Mr. Cipparone then told this Court that this individual received a sentence of 890 months. (*See* Shnewer Sentencing Tr. at p. 42-43) It is not altogether clear from the record whether this was Mr. Cipparone's attempt to raise an issue under § 3553(a)(6). However, such comparisons by Mr. Cipparone to this case without any further factual detail or elaboration did not present a "colorable" claim of unwarranted sentencing disparities that would have necessitated a need by this Court to respond. Accordingly, Mr. Cipparone was not ineffective when this Court did not expressly discuss its relevance to the § 3553(a)(6) factors. Furthermore, at no point did Mr. Cipparone indicate to this Court that the defendant in that other case was similarly situated to Mr. Shnewer, something that is important before determining whether there is an unwarranted sentence disparity. *See infra* Part V.A.ii.

Mr. Cipparone did not make a colorable argument with respect to section § 3553(a)(6) at sentencing, such that the duty of this Court to respond to that argument as set forth in *Friedman* was never triggered. *See* 658 F.3d at 362. Mr. Cipparone was not ineffective for failing to object to this Court's discussion of the § 3553(a)(6) factor in determining his sentence. This Court adequately addressed and considered the § 3553(a) factors such that Mr. Shnewer is not entitled to relief on this issue that Mr. Cipparone failed to object to this Court's analysis. *See Real v. Shannon*, 600 F.3d 302, 310 (3d Cir. 2010) (counsel not ineffective for failing to raise a meritless claim). This Court gave meaningful consideration to the § 3553(a) factors and § 3553(a)(6) was not particularly relevant because no colorable argument was ever brought to the attention of this Court on that factor and Mr. Shnewer was sentenced to the within advisory guidelines range of life.

ii.     *Trial Counsel Failure to Advance Sentencing Disparity Issue*

Mr. Shnewer also argues that Mr. Cipparone should have made a better attempt to argue that a life sentence amounted to an unwarranted disparate sentence. Mr. Shnewer claims that Mr. Cipparone was ineffective because he should have specifically cited several cases that illustrate that his life sentence constituted an unwarranted disparate sentence. A brief recitation of each case that Mr. Shnewer relies on and their relevant facts will be instructive in determining whether Mr. Shnewer has adequately stated an ineffective assistance of counsel claim on this issue.

In *Polk v. United States*, 118 F.3d 286, 289 (5th Cir. 1997), the petitioner was convicted of attempting to use a weapon of mass destruction, solicitation to commit a crime of violence under 18 U.S.C. § 844(f), solicitation to commit a crime of violence under 18 U.S.C. § 1114; possession (carrying) of a firearm during a crime of violence, unlawful possession of a machine

15

gun and aiding and abetting the making of a false statement to a federally licensed firearms

dealer. While the Fifth Circuit's opinion did not detail the sentencing guidelines range for Polk,

appellant's brief did. *See* Brief for Appellant, *Polk*, 1997 WL 33562544 at *7 (No. 96-40836).

The guideline range of the attempt to use a weapon of mass destruction was 168 to 210 months.

The possession of a firearm conviction carried a mandatory 60-month consecutive term of

imprisonment and the remaining counts had a statutory maximum of 120 months. *See id.* Polk

was initially convicted to a sentence of 249 months. *See Polk*, 118 F.3d at 291. The Fifth Circuit

though held that the evidence was insufficient to sustain the possession (carrying ) of a firearm

during a crime of violence conviction as well as the abetting the making of a false statement to a

federally licensed firearms dealer and the matter was remanded for resentencing. *See id.* at 298.

On remand, Polk was resentenced to 189 months. *See Polk v. Kastner*, 07-0014, 2008 WL

177844, at *1 (E.D. Tex. Jan. 18, 2008).

 Mr. Shnewer also cites to *United States v. Kikumura*, 706 F. Supp. 331 (D.N.J. 1989).

Kikumura was convicted of numerous weapons offenses as well as transportation and receipt of

explosive materials in interstate commerce without having obtained a proper license. *See id*. at

334. His Sentencing Guidelines range was calculated at twenty-seven to thirty-three months for

his conviction on twelve counts. *See id.* The District Court applied a number of upward

departures to eventually impose a sentence of 360 months. *See id.* at 346. On appeal, the Third

Circuit vacated the judgment of sentence and remanded with instructions to resentence

Kikimura. *See United States v. Kikumura*, 918 F.3d 1084 (3d Cir. 1990). On remand, the District

Court then imposed a sentence of 262 months. *See United States v. Kikumura*, 947 F.2d 72, 75

(3d Cir. 1991).

In *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001), the defendant was convicted of conspiracy to commit offenses against the United States as well as weapons and drug offenses. His criminal history category was VI and his total offense level was calculated to be 41 such that the Sentencing Guidelines range for Graham was 360 months to life imprisonment. Graham was sentenced to 660 months imprisonment. *See id.* at 500. Ultimately, the Sixth Circuit remanded Graham's case for resentencing in light of the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *See Graham*, 275 F.3d at 524. Subsequently, Graham was resentenced to fifty years imprisonment which the Sixth Circuit affirmed. *See United States v. Graham*, 327 F.3d 460, 466 (6th Cir. 2003).

Relying on *Polk*, *Kikumura* and *Graham*, Mr. Shnewer argues as follows:

> Mr. Cipparone could have presented to the court [the cases outlined above] as comparators in support of an argument that a life sentence would create an unwarranted sentencing disparity in relation to "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Petitioner had no criminal record, so the records of the defendants in the cited cases is irrelevant. And as for those defendants' conduct . . . their conduct was "similar" in the very least, and, in the case of Graham, Polk, and Kikumura, their conduct was arguably much more serious.

(Dkt. No. 13 at p. 17)[3]

"A defendant challenging his sentence based on § 3553(a)(6) must show that his 'circumstances exactly paralleled' those of the defendants who received lower sentences."

---

[3] In addition to relying on the three cases discussed *supra*, Mr. Shnewer also argues that Mr. Cipparone should have relied on *United States v. Amawi*, 695 F.3d 457 (6th Cir. 2012) in making a more forceful sentencing disparity argument under § 3553(a)(6) at his sentencing hearing. However, the defendants in that case had their sentences imposed in October, 2009. (*See* Dkt. No. 25-1 at p. 24-37) Mr. Shnewer was sentenced on April 29, 2009, or before the defendants in the *Amawi* case. Thus, Mr. Cipparone cannot be deemed ineffective for failing to argue that Mr. Shnewer's sentence constituted an unwarranted disparate sentence compared to the defendants in *Amawi* because the defendants in *Amawi* had not yet been sentenced at the time of Mr. Shnewer's sentencing in April, 2009.

*United States v. Bannout*, 509 F. App'x 169, 173 (3d Cir. 2013) (quoting *United States v. Iglesias*, 535 F. 3d 150, 161 n.7 (3d Cir. 2008)); *see also United States v. Bard*, 625 F. App'x 57, 60 (3d Cir. 2015) (stating that § 3553(a)(6) "only requires the court to consider 'sentence disparities' among defendants who are similarly situated in all relevant respects") (citing *United States v. Vargas*, 477 F.3d 94, 100 (3d Cir. 2007)). Furthermore, the Third Circuit has explained as follows:

> That [an appellant] can find another case where a defendant charged with a somewhat similar crime and facing the same advisory sentencing range received a sentence outside of the applicable sentencing range does not make [defendant's] within-Guidelines sentence unreasonable. If that were the law, any sentence outside of the Guidelines range would set precedent for all future similarly convicted defendants. That is not, and cannot be, the law.

*United States v. Jimenez*, 513 F.3d 62, 91 (3d Cir. 2008).

In this case, the cases that Mr. Shnewer argues that Mr. Cipparone should have brought to this Court's attention under § 3553(a)(6) did not involve circumstances that exactly paralleled his own. Indeed, Mr. Shnewer has not shown that any of the defendants in *Polk, Kikumura* and *Graham*, had a criminal history category of VI and an offense level of 51 such that life imprisonment was their exclusive advisory guidelines range. Furthermore, none of those defendants were convicted of the same crime as Mr. Shnewer, namely violating 18 U.S.C. § 1117. Thus, Mr. Cipparone was not ineffective by failing to argue these cases as Mr. Shnewer has not shown that they exactly paralleled Mr. Shnewer's case with respect to sentencing disparities since the defendants in those cases were not similarly situated to Mr. Shnewer. *See United States v. Vaughn*, 722 F.3d 918, 937 (7th Cir. 2013) (sentencing disparity warranted in light of different guidelines range); *United States v. Jones*, 208 F. App'x 507, 509 (8th Cir. 2006)

(sentencing disparity not unwarranted where defendant convicted of additional crime and had higher offense level and Guidelines range).

For the reasons stated above, Mr. Shnewer is not entitled to relief on any of his arguments in Claim I.

B. <u>Failure to Object to Use of Religious Beliefs in Determining Sentence</u>

In Claim II, Mr. Shnewer argues that Mr. Cipparone was ineffective by failing to object when this Court purportedly based Mr. Shnewer's sentence on his religion and was ineffective in failing to raise this issue on appeal. Additionally, Mr. Shnewer also makes a direct claim aside from ineffective assistance that this Court improperly used religion in sentencing him.

Mr. Shnewer bases Claim II on this Court's discussion at one of Mr. Shnewer's co-defendant's sentencing hearing, Serdar Tatar. More specifically, Mr. Shnewer relies on the emphasized statements noted below that this Court made at Mr. Tatar's sentencing hearing:

> The government argues for a life sentence. There are significant reasons why they are correct, and the life sentence is called for in this case. But that's not the end of the analysis. I thought long and hard about Mr. Tatar in this case. The Constitution and the laws of the United States give me the power to impose a sentence of life. Simply affixing my signature to a judgment of conviction condemns this man to spend the rest of his life in prison. I have the power to dictate what he does every day for the rest of his life. Enormous power. But with that comes tremendous responsibility. Responsibility to make sure I get it right. Because I don't have the ability, none of us has as judges have the ability to review our sentence in five years, 10 years, 20 years, 30 years. We have to get it right now. During and after this trial I always got the sense that Mr. Tatar was in a different category than the others. And we've talked about that today. The quantum of evidence is different and it may be as the government says. There just wasn't the connection that the other defendants had. But it was always something more to me and I couldn't put my finger on it. And I read, and I reread, and I reread the Presentence Report and Mr. Sparaco's brief and the letter and I read the Government's brief again and again and I reviewed the evidence and I too stayed up most of the night thinking about this and thinking about what I'm going to say. And

I finally put my finger on it. And what was said here today confirmed it. *I asked the government the question, what motivated this man. And it's the Government position its religious fervor. And indeed he does say it, I'm doing it in the name of Allah. But that's all he ever really says. That's the only time he ever invokes the name of the Lord. The only time he ever invokes a religious reason for doing any of this.* And I'm not impressed with it. I know a lot of people who invoke the name of their God. Very religious people, and I come away with this, simply not convinced by a preponderance of the evidence that he was driven to do this by any ideology of hatred or any religious fervor. I am absolutely convinced that he was going through with this, he was going to help this, he would do what he can do and to make this happen. That they were going to kill American soldiers merely because of the status. But what drove him was not what drove the other four defendants in this case. And that makes a difference. It makes a big difference. Because he's the only one of these defendants who I have any hope of rehabilitating through a prison sentence. The others are so consumed with hatred and their ideology of theirs that they're never going to change. I'm not convinced the same is true of Mr. Tatar.

Accordingly, I am not going to give him a sentence of life imprisonment. He's going to be punished severely for his actions and his desires and what he did that led up to his arrest.

Therefore, pursuant to the Sentencing Reform Act of 1984 it's the judgment of this court, that the defendant, Serdar Tatar, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 396 months.

(Tatar Sentencing Tr. at p. 66-68 (emphasis added)) Relying on the emphasized portion of Mr. Tatar's sentencing transcript, Mr. Shnewer argues that "when the sentencing court relied upon the number of times Tatar 'invoke[d] the name of Lord" versus the number of times Petitioner did so, he violated Petitioner's First Amendment and due process rights[.]" (Dkt. No. 13 at p. 23) More specifically, Mr. Shnewer asserts that this Court punished him for his mainstream religious expression of being a Muslim and that such punishment based on his religion is unconstitutional.

It is constitutionally impermissible to increase a defendant's sentence based on things such as the defendant's race, religion or political affiliation. *See Zant v. Stephens*, 462 U.S 862,

885 (1983); *see also United States v. Fisher*, 502 F.3d 293, 299 (3d Cir. 2007) ("[A] sentence is acceptable as long as it was untainted by considerations of race, gender or similar forbidden grounds) (citing *Jones v. Superintendent of Rahway State Prison*, 725 F.2d 40, 43 (3d Cir. 1984)). Nevertheless, "'the sentencing authority has always been free to consider a wide range of relevant material.'" *Dawson v. Delaware*, 503 U.S. 159, 164 (1992) (quoting *Payne v. Tennessee*, 501 U.S. 808, 820-21 (1991)) (other citations omitted). Indeed, "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Id.* at 165.

At the outset, this Court expressly states that the fact that Mr. Shnewer is a practicing devout Muslim had nothing to do with this Court's decision to sentence him to the within advisory Guideline range of life imprisonment. Instead, this Court made clear during Mr. Shnewer's sentencing hearing (and reiterated during Mr. Tatar's sentencing hearing) that it was Mr. Shnewer beliefs in *violent* radical Islamic ideology that led the Court to determine that Mr. Shnewer would be sentenced to the within advisory Guidelines range of life imprisonment. It was Mr. Shnewer's belief in *violent* radical Islamic ideology that led this Court to conclude that he could not be rehabilitated and that the public needed to be protected from him. Indeed, to reiterate, at Mr. Shnewer's sentencing, this Court stated as follows:

> And I also heard the months after months of tapes. Which indicates to me that he is so deeply committed to this ideology and this desire to kill that he can't be that he can't be rehabilitated. [¶] The public needs to be protected from him, because he will commit other crimes if given a chance.

(Shnewer Sentencing Tr. at p. 51) Indeed, by way of example only, at one point, Mr. Shnewer told one of the informants that he "love[s] to kill Jews," and that it was a dream of his to kill

Jews. (*See* Dkt. No. 25-1 at p. 46) The § 3553(a) factors plainly permit this Court to consider the need to afford adequate deterrence to criminal conduct and to protect the public from further crimes by Mr. Shnewer. *See* 18 U.S.C. § 3553(a)(2)(B) & (C). This Court expressly made this relevant distinction at Mr. Tatar's sentencing hearing when it noted that Mr. Tatar's co-defendants (the Duka brothers and Mr. Shnewer) were "so consumed with hatred and their ideology of theirs that they're never going to change." (Tatar Sentencing Tr. at p. 68) This Court did not use Mr. Shnewer's devout Muslim faith to help this Court reach the conclusion that it would sentence him to the within advisory Guidelines range of life imprisonment, but rather, as clearly stated in the sentencing transcript and reiterated in this Opinion, this Court believed that Mr. Shnewer could not be rehabilitated and therefore posed a threat if released based upon his *violent radical* Islamic beliefs. This did not run afoul of the Constitution and did not amount to this Court using Mr. Shnewer's devout Muslim faith to determine his sentence. *Accord United States v. Abu Ali*, 410 F. App'x 673, 682 (4th Cir. 2011) ("The Court properly considered the tenacity of Abu Ali's violent beliefs and the likelihood that time in prison would entrench those beliefs in analyzing the probability that Abu Ali would again act on those beliefs if released. In light of Congress's instruction for courts to consider the need to 'protect the public from further crimes of the defendant' in imposing a sentence, it is hard to see how the district court's actions were erroneous.") (citing 18 U.S.C. § 3553(a)(2)(C)); *United States v. Yaghi*, Crim. No. 09-0216, 2012 WL 147955, at *4 (E.D.N.C. Jan. 18, 2012) (noting defendant's association with individuals intent on advancing a destructive ideology, "cloaked in adherence to an extremist view of Islam, which propagated violence against anyone perceived as being in Muslim lands unjustly, coupled with his demonstrated disregard for the law, underscore this defendant's dangerousness" warrant a substantial sentence in deference "to the need to promote respect for

the law, deter this type of conduct, and protect the public"), *aff'd*, *United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014). Comparatively, this Court sentenced Mr. Tatar to 396 months because it concluded in part that Mr. Tatar did not possess the same *violent radical* beliefs that Mr. Shnewer held. Thus, unlike Mr. Shnewer, Mr. Tatar had a chance to be rehabilitated.

Mr. Shnewer cites to *United States v. Bakker*, 925 F.2d 728 (4th Cir. 1991) in support of Claim II. However, *Bakker* is easily distinguishable from Mr. Shnewer's case. In *Bakker*, the Fourth Circuit analyzed the sentence of the well-known televangelist James O. Bakker on his convictions of fraud and conspiracy. During Bakker's sentencing, the judge stated as follows: "He had no thought whatever about his victims and *those of us who do have a religion are ridiculed as being saps from money-grubbing preachers or priests*." *Id.* at 740 (emphasis in original). The Fourth Circuit noted that a judge acts impermissibly when he takes his own religious characteristics into account at sentencing. *See id*. The Fourth Circuit held as follows:

> Courts . . . cannot sanction sentencing procedures that create the perception of the bench as a pulpit from which judges announce their personal sense of religiosity and simultaneously punish defendants for offending it. Whether or not the trial judge has a religion is irrelevant for purposes of sentencing. Regrettably, we are left with the apprehension that the imposition of a lengthy prison term here may have reflected the fact that the court's own sense of religious propriety had somehow been betrayed. In this way, we believe that the trial court abused its discretion in sentencing Bakker.

*Id.* at 740-41.

Unlike *Bakker*, this Court never discussed its own religious characteristics at arriving at a sentence for Mr. Shnewer (as well as arriving at Mr. Tatar's sentence). Instead, as stated above, this Court's discussion at Mr. Shnewer and Mr. Tatar's sentencing of their violent beliefs related to the relevant considerations of whether this Court believed the public needed to be protected from them and whether either could be rehabilitated. Ultimately, this Court determined that Mr.

Tatar had the chance to be rehabilitated and Mr. Shnewer did not. This Court determined that Mr. Shnewer was so consumed with hatred that he was never going to change whereas Mr. Tatar was not so consumed. *Bakker* is not applicable to this case.

To sum up Claim II, this Court did not sentence Mr. Shnewer to a life sentence based on his devout Muslim faith. Instead, this Court properly applied the three-step sentencing process outlined in *Levinson*. Ultimately, in analyzing the § 3553(a) factors, this Court determined that Mr. Shnewer's violent radical beliefs could not be changed, something that was plainly proper for this Court to consider. It thus follows that Mr. Cipparone was not ineffective for failing to raise this claim that lacks merit during Mr. Shnewer's sentencing proceedings or on appeal. *See Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) ("[C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.") (citation omitted); *United States v. Jackson*, No. 09-5255, 2010 WL 1688543, at *8 (E.D. Pa. Apr. 27, 2010) ("Under *Strickland*, Jackson's appellate counsel cannot be ineffective for failing to raise a meritless issue on appeal.") (citing *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999)). Therefore, for the reasons stated above, Mr. Shnewer is not entitled to relief on Claim II.

   C.   <u>Claim III – Failure to Communicate Plea Offer and Pursue Plea Discussions</u>

In Claim III, Mr. Shnewer argues that Mr. Cipparone was ineffective when he failed to communicate a plea offer to him. Additionally, Mr. Shnewer argues that Mr. Cipparone was ineffective for failing to pursue plea discussions with the respondent. Each of these issues is considered in turn.

i.  *Failure to Communicate Plea Offer*

Mr. Shnewer first argues that Mr. Cipparone was ineffective when he failed to communicate a plea offer to him. In support of this argument, Mr. Shnewer states as follows in his declaration:

> In 2009, while at the Communications Management Unit at U.S.P. Marion, where I am still housed, Mr. Cipparone sent me a hard drive containing documents pertaining to my case. Among those documents was a letter from AUSA Stephen Stigall dated June 22, 2007, to Mr. Cipparone. The majority of the letter is devoted to discovery issues. One paragraph, however, discusses the U.S. Attorney's Office's position concerning the additional one-point reduction under § 3E1.1(b) of the Sentencing Guidelines, "in the event your client has not entered a plea of guilty before the filing of pre-trial motions." A second letter from Mr. Stigall dated July 16, 2007, repeats this information.

(Dkt. No. 13 at p. 52)[4]

In *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012), the Supreme Court affirmatively held that, "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." It further stated that "the

---

[4] U.S.S.G. § 3E1.1 states as follows:

> (a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

> (b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

U.S.S.G. § 3E1.1.

fact of a formal offer means that its terms and its processing can be documented so that what took place in the negotiation process becomes more clear if some later inquiry turns on the conduct of earlier pretrial negotiations." *Id.* at 1409. Thus, when defense counsel fails to communicate formal plea offers to the defendant, it constitutes deficient performance under *Strickland*. *See id.* Once the first prong of *Strickland* is met, then the petitioner has to show prejudice. In this context, the Supreme Court in *Frye* also explained what is needed for a petitioner to show prejudice:

> To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law. To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.

*Frye*, 132 S. Ct. at 1409 (citing *Glover v. United States,* 531 U.S. 198, 203 (2001)). As one court has noted therefore:

> A petitioner . . . who seeks to establish a claim of ineffective assistance of counsel in the context of plea bargaining, consequently must make a double showing – (1) that the prosecutor extended the plea offer and (2) that his or her attorney either failed to communicate the offer to him or misadvised him concerning the advantages and disadvantages of the offer so as to cause the non-acceptance of an otherwise beneficial outcome by a favorable guilty plea.

*Compean v. United States*, No. 12-0730, 2013 WL 6196517, at *7 (W.D. Ky. Oct. 18, 2013)

(citing *Lint v. Prelesnik*, No. 09-10044, 2011 WL 3241840, at *11 (E.D. Mich. July 29, 2011);

*Robinson v. United States*, 744 F. Supp. 2d 684, 696 (E.D. Mich. 2010); *report and*

*recommendation adopted by*, 2013 WL 6196533 (W.D. Ky. Nov. 26, 2013).

Mr. Shnewer claims that the government has conceded the first prong of *Strickland* in that Mr. Cipparone failed to inform him about a plea offer. (*See* Dkt. No. 12 at p. 13) However, the respondent has not conceded anything with respect to the first prong of the *Strickland* analysis. Instead, it asserts that there was never a plea offer for Mr. Cipparone to communicate to Mr. Shnewer such that Mr. Cipparone was not ineffective because a plea offer never existed.

Whether Mr. Shnewer was ever offered a formal plea offer is obviously a vital factor in determining whether Mr. Cipparone's counsel was ineffective with respect to this claim as mere informal plea discussions are not enough to trigger Mr. Cipparone's duty to inform Mr. Shnewer. *See Hull v. United States*, No. 15-0123, 2015 WL 5009998, at *2 (W.D. Wis. Aug. 15, 2015) ("The Court made clear in *Frye*, that duty applies only when the plea offer is a 'formal one.' The Court has never held that defense counsel can be found constitutionally ineffective for failing to tell their clients about informal discussions they have with the government about possible plea offers."); *Mavashev v. United States*, No. 11-3724, 2015 WL 1508313, at *9 (E.D.N.Y. Mar. 31, 2015) (noting that there is a significant distinction between formal plea offers and informal plea offers); *United States v. McCall*, No. 00-0505, 2014 WL 2581353, at *3 (N.D. Cal. June 9, 2014) ("In reality, there is either a formal plea offer, or in its absence, mere discussions between counsel. Mere conversations are rarely recorded and always subject to interpretation and mis-remembering. It would be a near-impossible burden to require defense counsel to update defendant on each twist and turn in informal conversations. And it would be impossible for the government to reconstruct and prove each such twist and turn in the communication, much less prove that defense counsel passed on the twists and turns to their client. . . . Therefore, to transmogrify mere conversation into an "informal plea offer" and then to further say it must be communicated to an accused on pain of Section 2255 relief would be a nifty sleight of hand.")

(citations omitted); *United States v. Merlino*, Crim. No. 99-10098, 2014 WL 793987, at *4 (D. Mass. Feb. 28, 2014) ("A majority of courts . . . have held that a formal plea offer must consist of something more than preliminary oral communications.") (citations omitted); *Montgomery v. United States*, No. Crim. 07-00036, 2013 WL 6196554, at *4 (W.D. Ky. Nov. 26, 2013) ("Although there has been little exposition regarding the precise definition of the term "formal offer," the Court clearly intended to distinguish "offers" made during the course of preliminary negotiations from those made once negotiations have concluded. In other words, while there is no touchstone for assessing the formality of an offer, there must at the very least be some basis for concluding that the alleged offer could have been accepted or rejected without further discussion or negotiation."); *Compean*, 2013 WL 6196517, at *7 ("The threshold issue for the Court therefor is whether the Government ever extended a formal plea offer to the Defendant in the first instance.") (citing *Guerrero v. United States*, 383 F.3d 409, 417 (6th Cir. 2004); *Strollo v. United States*, No. 05-0113, 2007 WL 2071940, at *3 (N.D. Ohio July 16, 2007)).

Neither party has provided this Court with definitive case law from either the United States Supreme Court or the United States Court of Appeals for the Third Circuit on what constitutes a "formal plea offer." *See, e.g.*, *United States v. Waters*, No. 13-0115, 2013 WL 3949092, at *8 (E. D. Pa. July 31, 2014) ("[W]e have been unable to find any authority defining the requisite elements of a formal plea offer…"). Indeed, "District Court decisions construing the term [formal plea offer] appear to largely rest on the unique facts of the case under consideration." *Merlino*, 2014 WL 793987, at *4. Nevertheless, courts look to several factors in considering whether the prosecutor extended a formal plea offer. One court has noted that plea agreements "are essentially contracts" and that "for a contractual offer to exist, it must contain 'sufficiently definite terms to enable [a] fact finder to interpret and apply them." *United States v.*

*Petters*, 986 F. Supp. 2d 1077, 1082 (D. Minn. 2013) (quoting *Neb. Beef, Ltd. v. Wells Fargo*

*Bus. Credit, Inc.*, 470 F.3d 1249, 1251 (8th Cir. 2006)). Thus, in *Petters*, the District of

Minnesota determined that a formal plea offer had not been extended because there was "an

absence of any discussion of the charges to which Petters would acknowledge guilt, the factual

basis for a plea, or restitution or forfeiture issues." *Id.* A court in this Circuit has similarly stated

that, "it is clear that an oral discussion of the sentencing range for a possible plea agreement that

does not include an agreement on the charges to which the defendant will plead guilty and the

facts that he will admit, does not constitute a formal plea offer." *Waters*, 2013 WL 3949092, at

*8 (citing *Enright v. United States*, 347 F. Supp. 2d 159, 165 (D.N.J. 2004)).

Mr. Shnewer has not attached copies of Mr. Stigall's letters that he relies upon to

establish that there was a formal plea offer because he states that institution staff will not let him

print them out. The respondent has also not provided this Court with copies of the Stigall letters

that Mr. Shnewer references. However, their omission does not prevent this Court from

determining whether they constituted a "formal plea offer." Assuming for purposes of argument

that the letters say what Mr. Shnewer states they say, they did not constitute a formal plea offer.

Indeed, Mr. Shnewer merely states that Stigall referenced a possible additional one-point

reduction under U.S.S.G. § 3E1.1(b). However, Mr. Shnewer does not state that Stigall's letters

discussed the charges to which he would have to plead guilty to nor does it discuss the factual

basis for the plea. Accordingly, even if Mr. Shnewer's representations of the Stigall letters are

accurate, they do not constitute a formal plea offer. Therefore, they did not trigger a duty on Mr.

Cipparone to inform Mr. Shnewer about them.

The fact that the Stigall letters did not constitute a formal plea offer does not end this

Court's analysis on this issue. Indeed, the government submitted declarations from Mr. William

E. Fitzpatrick, the lead prosecutor in this case, and Mr. Cipparone, which indicate that there certainly were some preliminary discussions regarding a potential plea. The question then becomes, like the Stigall letters, whether these discussions constituted a "formal plea offer" to trigger a duty on Mr. Cipparone to inform.

Mr. Fitzpatrick states as follows in his declaration:

> I engaged in informal plea discussions with Mr. Cipparone at an early point in the District Court proceedings. In that context, we discussed a possible plea agreement in which, in return for Shnewer's guilty plea to the charge of conspiracy to murder uniformed soldiers of the United States, in violation of 18 U.S.C. § 1117, the Government would not subject Shnewer to the charge of attempted possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c). The § 1117 charge subjected Shnewer to a maximum term of incarceration of life imprisonment.
>
> I informed Mr. Cipparone, however, that the final decision regarding any plea agreement involving Shnewer and his codefendants would be made by then United States Attorney, Christopher J. Christie, and that I had not been authorized to commit the United States to any particular agreement.
>
> During those discussions, I informed Mr. Cipparone that, at sentencing, the Government would take the position that the Sentencing Guidelines "terrorism enhancement," U.S.S.G. § 3A1.4, applied to Shnewer, and that if the Court agreed, the applicable Guidelines range would be exclusively life imprisonment.
>
> I also informed Mr. Cipparone that, based on the Government's assessment of the sentencing factors under 18 U.S.C. § 3553(a), a sentence of life imprisonment would be the only reasonable sentence in this case, and that the Government would advocate at sentencing for a custodial term of life.
>
> Under no circumstances would the Government have entered into a guilty plea agreement with Shnewer that would not have allowed for the imposition of a sentence of life imprisonment. At no point would the Government have agreed to advocate for a sentence of less than life imprisonment.

(Dkt. No. 29 at p. 1-3) Mr. Cipparone also states in his declaration that Mr. Fitzpatrick's declaration is consistent with his own recollection of discussions about a possible non-trial disposition of the charges against Mr. Shnewer. (*See* Dkt. No. 25-1 at p. 4)

In determining whether a formal plea offer has been extended, a court in this Circuit emphasized that a prosecutor's lack of authority to bind the government means that the plea offers lack the requisite formality to constitute a formal plea offer. *See Waters*, 2013 WL 3949092, at *10 n.3 ("[T]here is no evidence of record that Holtz, the only Assistant District Attorney *with the authority* to make a formal plea offer to a defendant in a major case in April, 2010, made a formal plea offer to Waters.") (emphasis added); *see also Merlino*, 2014 WL at 793987, at *4 ("In finding plea offers to lack the requisite formality, some courts have emphasized the prosecutor's lack of authority to bind the government.") (citations omitted). In this case, Mr. Fitzpatrick's declaration makes clear that only Mr. Christie had the authority to bind the respondent to a particular agreement. However, neither Mr. Shnewer nor the respondent state that Mr. Christie ever gave his authority to permit Mr. Fitzpatrick to enter into a plea agreement with Mr. Shnewer. Furthermore, the plea discussions between Mr. Fitzpatrick and Mr. Cipparone never reached the level of a formal plea offer as neither indicates the facts that Mr. Shnewer would have had to admit to if he was to plead guilty. *See Petters*, 986 F. Supp. 2d at 1082 (noting factual basis for the plea is important in determining whether a "formal plea offer" has been extended); *Waters*, 2013 WL 3949092, at *8 (oral discussion of sentencing range for possible plea agreement that does not include facts that he will admit does not constitute a formal plea offer).

Therefore, neither Mr. Stigall's letters (as represented by Mr. Shnewer), nor the communications between Mr. Fitzpatrick and Mr. Cipparone reached the level of the government

extending a formal plea offer. Accordingly, Mr. Cipparone was not ineffective by failing to communicate a formal plea offer to Mr. Shnewer because no formal plea offer ever existed in this case.

    ii.    *Failure to Pursue Plea Discussions*

In his § 2255 motion, Mr. Shnewer also alludes to a separate and distinct issue in Claim III besides the one discussed *supra* Part V.C.i. Indeed, Mr. Shnewer asserts that Mr. Cipparone was ineffective when he failed to pursue plea discussions with the prosecution when he learned prosecutors were amenable to such discussions. (*See* Dkt. No. 1 at p. 5) Mr. Shnewer and Mr. Cipparone differ with respect to what Mr. Shnewer told Mr. Cipparone regarding seeking a plea offer from the respondent. Mr. Shnewer states as follows in his declaration:

> I made it very clear to Mr. Cipparone that, in light of the near certainty of conviction and life imprisonment resulting from a trial, I was very interested in any plea offer from the prosecution. I particularly recall having these conversations with Mr. Cipparone during the conferences with my codefendants and their attorneys we participated in at the Federal Detention Center in Philadelphia. I and my codefendants discussed this with Mr. Cipparone as well as with my codefendants' attorneys.
>
> In response to my questions and attempts to encourage Mr. Cipparone to engage in guilty plea discussions with the prosecution, he told me that he didn't see the government offering any plea deals, and that the government was more interested in taking the case to trial. In particular, I recall Mr. Cipparone saying that he believed then-United States Attorney Chris Christie wanted to take the case to trial, rather than resolve it with guilty pleas, in order to make political gains from our convictions.
>
> Mr. Cipparone never told me about any plea offers or discussions that he had with the prosecution, at any time before, during, or after trial.
>
> If I had been aware of any plea offer by the government that would have increased my chances of avoiding a life sentence, I would have accepted the offer and pleaded guilty. That is because I was convinced of my dismal, virtually non-existent chance of acquittal

and avoiding a life sentence with a trial. In fact, the only reason I
went to trial is because I felt cornered into doing so by the apparent
lack of any plea offers.

(Dkt. No. 13 at p. 50-51) Mr. Cipparone has quite a different take on his discussions with Mr.

Shnewer as it related to his plea discussions with the government. Indeed, Mr. Cipparone states

as follows in his declaration:

> After reviewing the substantial discovery provided by the
> Government in the criminal case, and particularly the numerous
> recorded conversations between Mr. Shnewer and the two persons
> who acted as cooperating witnesses for the Government in this
> investigation, as well as conversations between Mr. Shnewer and
> his alleged co-conspirators, I concluded that the evidence against
> Mr. Shnewer, on its face, was very strong.
>
> I advised Mr. Shnewer that in my opinion, if he took the charges
> against him to trial, he faced a substantial risk of conviction and
> likely would be sentenced to life imprisonment or at least a very
> substantial term of imprisonment that would keep him incarcerated
> for most of his productive vital life years.
>
> I also advised Mr. Shnewer that at trial the decision about whether
> or not he would testify in his own defense exclusively was his, not
> mine, and that although I would offer advice about the decision, he
> had to make the decision at the appropriate time.
>
> Notwithstanding the above, Mr. Shnewer did not direct me to
> engage the Government in plea discussions.
>
> Nevertheless, as is my practice in all federal criminal prosecutions
> in which I represent a client, I initiated plea discussions with the
> lead prosecutor in this case, then Deputy United States Attorney
> William Fitzpatrick.
>
> I have reviewed Mr. Fitzpatrick's declaration that was filed on this
> case on December 16, 2013, Docket 10-1. Mr. Fitzpatrick's
> statements in that declaration are in all material respects fully
> consistent with my own recollection of our discussions about a
> possible non-trial disposition of the charges in this case.
>
> In particular, Mr. Fitzpatrick informed me that, given the nature
> and significance of the charges against Mr. Shnewer, any decisions
> regarding the terms of a possible plea agreement between the

Government and Mr. Shnewer would have to be approved by the then United States Attorney, Christopher Christie.

Mr. Fitzpatrick also informed me that he would consider recommending to Mr. Christie that the Government offer a plea agreement with Mr. Shnewer in which he would plead guilty to charge of the conspiracy to commit murder in the Indictment in exchange for the Government dropping the weapons charge against him.

Mr. Fitzpatrick said that he would not recommend to Mr. Christie and Mr. Christie likely would not approve, any agreement that would provide for a maximum sentence less than life imprisonment for Mr. Shnewer.

Mr. Fitzpatrick also informed me that he would not recommend to Mr. Christie, and Mr. Christie would not likely approve, an agreement that would prevent the Government from recommending to the Court a life imprisonment sentence for Mr. Shnewer.

Mr. Fitzpatrick informed me (as I was of course aware) that the statutory maximum sentence for the Count One charge of conspiracy to commit murder was life imprisonment, and that if Mr. Shnewer determined to plead guilty the Government would insist on taking the position at sentencing that the properly calculated Guidelines range also was life imprisonment, and that the government would take the position that a sentence of life imprisonment would be the appropriate and reasonable sentence under 18 U.S.C. § 3553(a).

At no time did Mr. Fitzpatrick or anyone else convey to me a formal offer for Mr. Shnewer to enter into a plea agreement with the United States.

In the District of New Jersey, in my experience such offers are invariably reduced to writing in the form of a letter from the United States Attorney's Office to the defense attorney. I never received such a letter in this case, and never received an oral offer form the Government containing the terms of a possible plea agreement. The conversations with Mr. Fitzpatrick were negotiations and exploratory conversations.

I kept Mr. Shnewer abreast of my conversations with Mr. Fitzpatrick, limited as they were, about a possible non-trial disposition of the charges.

34

> Mr. Shnewer ultimately decided that he would not accept a plea agreement that carried the possibility of life imprisonment, and concerning which the government would recommend a life sentence as I understood it would, and decided to exercise his constitutional right to trial putting the government to its burden to prove the charges at trial.

(Dkt. No. 25-1 at p. 3-6) It appears based on the above as if Mr. Shnewer and Mr. Cipparone are at odds as to level of communication that they had with each other with respect to any plea discussions and negotiations.

"[T]here is no constitutional right to a plea bargain; the prosecutor need not do so if he prefers to go to trial." *Weatherford v. Bursey*, 429 U.ZS. 545, 561 (1977). "The decision whether to enter into a plea agreement or to pursue a trial is strictly within the discretion of the prosecutor." *Bresko v. John*, 87 F. App'x 800, 802-03 (3d Cir. 2004) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *Santobello v. New York*, 404 U.S. 257 (1971); *Brooks v. George County, Miss.*, 84 F.3d 157, 168 (5th Cir. 1996)); *see also Morgano v. Ricci*, No. 08-1524, 2010 WL 606503, at *5 (D.N.J. Feb. 18, 2010).

In this case, as outlined above, no formal plea offer was ever extended to Mr. Cipparone for Mr. Shnewer. Since *Frye*, courts have examined whether counsel can be ineffective when there has not been a formal plea offer to differing results. For example, in *United States v. Cook*, No. 10-20716, 2014 WL 4704843, at *4 (E.D. Mich. Sept. 21, 2014), the court stated as follows:

> Cook has not provided this Court with any case where a court determined that an attorney provided ineffective assistance by failing to engage in plea negotiations when no plea deal was ever offered by the prosecutor. To the contrary, courts regularly dismiss such claims where a plea offer was never made. *See, e.g., Justice v. Sepanek,* No. 12–74, 2013 WL 954115, at *4 (E.D. Ky. Mar.11, 2013); *Young v. United States,* No. 08-0302, 2011 WL 4497869, at *9 (E.D. Tenn. 2011). As there is no substantive right to pursue and enter into plea negotiations with the Government, counsel could not have been ineffective for failing to pursue a plea deal.

*Cook*, 2014 WL 4704843, at *4. District Judge Wolfson of this Court similarly stated in *McClain v. United States*, 12-2205, 2013 WL 1163562, at *4 (D.N.J. Mar. 19, 2013) as follows:

> Petitioner's challenges arising from his belief that counsel had a constitutional duty to seek a plea deal and/or to counsel Petitioner on the benefits and obligations of a hypothetical plea offer are without merit. That Petitioner's counsel did not seek a plea deal and did not discuss with Petitioner any aspects of a hypothetical plea deal does not constitute deficient performance under *Strickland*.

*McClain*, 2013 WL 1163562, at *4 (footnote omitted). However, this Court has also discovered cases post-*Frye* where courts have noted that a petitioner can show that counsel's performance has the potential rise to the level of ineffectiveness in the absence of a formal plea offer. For example, one court has stated as follows:

> The court is also persuaded by Defendant's argument that "[i]t is submitted that even if a firm offer is not conveyed to defense counsel, when the government indicates it is willing to negotiate a resolution in a case, defense counsel has a duty to engage in the negotiation process. Counsel can be constitutionally ineffective in the plea negotiation process if they fail to convey to the defendant the government's articulated willingness to resolve a case by negotiation or have proposed a resolution to the case." (Def.'s Mem. Supp. Mot. Compel 23 [Dkt. No. 332].) This reasoning is consistent with the language and implications of *Frye* and *Lafler*: "The reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages." *Frye,* 132 S. Ct. at 1407; *accord Lafler* [*v. Cooper*, 1376,] 1384 [(2012)].

*United States v. Polatis*, Crim. No. 10-0364, 2013 WL 1149842, at *10 n.16 (D. Utah Mar. 19, 2013). Indeed, more recently, a court in the District of Kansas cited to *Polatis* approvingly and stated as follows:

> [T]he Court cannot conclude that defendant may not pursue this claim in the absence of a formal plea offer from the Government. The Supreme Court emphasized in *Frye* that the plea bargain

> process was a critical stage with respect to which defense counsel
> has a duty to provide adequate representation under the Sixth
> Amendment. If defense counsel acted unreasonably during that
> process and defendant can establish that a plea agreement would
> have resulted if not for that deficient performance, the Court sees
> no reason why the usual two-part *Strickland* test should not be
> applied. It may be more difficult for a defendant to establish the
> necessary prejudice in the absence of a formal plea offer, since the
> defendant would be required to show that the Government would
> in fact have made a particular offer, that the defendant would have
> accepted it, and that the Court would have accepted the plea
> agreement. *See Frye,* 132 S. Ct. at 1410–11 (discussing required
> showing for prejudice); *see also Merzbacher* [*v. Shearin*], 706 F.3d
> [356,] 369–70 [(4th Cir. 2013)] (plea offer's "nascence figures
> prominently in the calculus" of determining prejudice).
> Defendant's claim in not necessarily foreclosed, however, by the
> absence of a formal plea offer.

*United States v. Brooks*, No. 10-20078, 2015 WL 5837636, at *6 (D. Kan. Oct. 6, 2015).

This Court is hesitant to analyze this issue under the first prong of *Strickland* without at least conducting an evidentiary hearing where the relevant witnesses' credibility could be analyzed in light of the different versions of events as stated in Mr. Shnewer and Mr. Cipparone's declarations. (*Compare* Dkt. No. 13 at p. 51 ("Mr. Cipparone never told me about any plea offers or discussions that he had with the prosecution, at any time before, during, or after trial."), *with* Dkt. No. 25-1 at p. 3, 5 ("Mr. Shnewer did not direct me to engage the Government in plea discussions. . . . I kept Mr. Shnewer abreast of my conversations with Mr. Fitzpatrick, limited as they were, about a possible non-trial disposition of charges.")) This is particularly so given the differing opinions from various courts regarding whether a petitioner can state an ineffectiveness claim absent a formal plea offer as outlined above. However, despite this Court's hesitancy to engage in a *Strickland* prong one analysis at this time, this does not necessarily mean that this claim cannot be decided at this time absent an evidentiary hearing. Indeed, this Court may decide this issue on prejudice grounds if it is possible to do so. *See Rainey*, 603 F.3d at 201.

Mr. Shnewer admits in his memorandum or law (*see* Dkt. No. 13 at p. 27-28), that he needs to show three things to a reasonable probability to establish prejudice:  (1) he would have accepted the plea; (2) the plea would have been entered; and (3) the end result of the criminal process would have been more favorable by reason of pleading to a lesser charge or a shorter prison sentence. *See Frye*, 132 S. Ct. at 1409 (citing *Glover*, 531 U.S. at 203). For the following reasons, Mr. Shnewer fails to show that he was prejudiced had Mr. Cipparone pursued plea negotiations further.

First, even assuming for purposes of argument only that Mr. Cipparone should have pursued plea negotiations further, Mr. Shnewer would presumably have to show that the government would have in fact made him a particular plea offer. *See Brooks*, 2015 WL 5837636, at *6. That showing simply has not been made in this case. Indeed, to reiterate, Mr. Fitzpatrick's declaration states that the final decision regarding any plea agreement was up to Mr. Christie and that he had no authority to bind the government. (*See* Dkt. No. 29 at p. 2) This case never reached that stage. Nevertheless, Mr. Cipparone does state in his declaration that Mr. Fitzpatrick informed him that he would consider recommending to Mr. Christie that the government offer a plea agreement where Mr. Shnewer would plead guilty to Count 1 in exchange for dropping Count 4. (*See* Dkt. No. 25-1 at p. 4) However, importantly, at no time does any party state that Mr. Christie, the person with the authority to bind the government in this case, would have in fact agreed to extend a formal plea offer to Mr. Shnewer. Thus, Mr. Shnewer fails to show that he was prejudiced by Mr. Cipparone's purported failure to engage in further plea discussions because he has not shown that any formal plea offer would have ever been extended by Mr. Christie in his case.

The precise contours of what a potential plea offer would have looked like amounts to mere speculation in this case. However, both Mr. Fitzpatrick and Mr. Cipparone's declarations indicate that there was at least some discussion about a *potential* plea whereby Mr. Shnewer would plead guilty to Count 1 – conspiracy to murder members of the United States military in exchange for dropping Count 4 – attempted possession of a firearm in furtherance of a crime of violence. Ultimately, after Mr. Shnewer's conviction on Count 4 was reversed on direct appeal, the judgment of conviction was entered against Mr. Shnewer only on Count 1. Thus, the potential plea that was discussed by the government and Mr. Cipparone would not have amounted to Mr. Shnewer pleading to a lesser charge than the one he was ultimately convicted of. However, this does not necessarily end the prejudice analysis. Mr. Shnewer could potentially show prejudice if he could show to a reasonable probability that he would have received a lesser sentence in light of a hypothetical plea offer.

Mr. Shnewer's conviction on Count 1 called for a base level offense of 33. *See* U.S.S.G. § 2A1.5(a); *see also* Presentence Investigation Report at p. 63. Additionally, Mr. Shnewer's conviction included a six-point adjustment for official victims and a twelve point terrorism adjustment. Accordingly, his total offense level was 51.[5] Furthermore, Mr. Shnewer's criminal

---

[5] Mr. Shnewer asserts that Mr. Fitzpatrick's declaration asserts that the "proposed" plea agreement would have advocated for the twelve point terrorism enhancement but omits any mention of the official victims enhancement. According to Mr. Shnewer then, this would have made his offense level 45, and with a three-point reduction for accepting responsibility, would have placed him at offense level 42 which has an advisory Guidelines range of 360 months to life imprisonment. (*See* Dkt. No. 12 at p. 15) While Mr. Fitzpatrick's omits any discussion of the official victim six-point enhncement, at no point does Mr. Fitzpatrick indicate that the government would have ever offered a plea that did not include this enhancement. Thus, Mr. Shnewer's fails to show that the government would have in fact offered a particular plea deal that took the official victim enhancement off of the table. Indeed, Mr. Fitzpatrick indicates that it would have never agreed to advocate to a sentence of less than life imprisonment and that the government believed a life sentence was the only reasonable sentence in this case. Thus, it would certainly follow that the government would seek to include all relevant enhancements in attempting to secure that this Court would sentence Mr. Shnewer according to an advisory

history category for his conviction was Category VI. *See* U.S.S.G. § 3A1.4(b). Thus, as

previously indicated, Mr. Shnewer's advisory guidelines range was literally "off-of-the-chart"

and carried with it an exclusive advisory guidelines sentence of life imprisonment.

Mr. Shnewer's memorandum of law in support of his § 2255 motion sets forth five

reasons why he would have received a lesser sentence of life imprisonment if he had pled guilty

pursuant to a hypothetical plea offer. Mr. Shnewer first argues that his sentence would have been

more lenient if he had pled guilty because of "the consideration he would have received for

helping to conserve judicial and government resources." However, as respondent notes, this

would have given Mr. Shnewer a three-point reduction under U.S.S.G. § 3E1.1(b). Thus, his new

offense level would have been 48, which would still have placed Mr. Shnewer "off-of-the-chart"

at an advisory sentencing range of exclusively life. As courts have noted with respect to showing

prejudice, "[w]hen a defendant would have been subject to the same guideline range

notwithstanding counsel's alleged error, the defendant must demonstrate a reasonable probability

that, in the absence of the error, the specific sentence would have been lower." *Zelaya v. United*

*States*, No. 10-2509, 2013 WL 4495788, at *4 (D. Md. Aug. 20, 2013) (citing *Shaheed v. United*

*States,* Civ. No. 07–1167, 2010 WL 3809854, at *6 (W.D. Pa. Sept. 22, 2010) (citing *United*

*States v. Ivory,* No. 09–2376, 2010 WL 1816236, at *3 (D. Kan. Feb. 26, 2010); *Pena–Carrizoza*

*v. United States,* No. 04–475, 2006 WL 2992556, at *4 (D. Utah Oct. 17, 2006))). Here, by

agreeing to this purported hypothetical plea offer, Mr. Shnewer would have remained at the same

advisory guideline range as he had if he went to trial as both were "off-of-the-chart."

---

guideline range that only included life imprisonment. Furthermore, even under this scenario, Mr.
Shnewer's advisory guideline range would still have included life imprisonment (albeit not
exclusively) and the § 3553(a) factors that this Court analyzed at sentencing for warranting a life
sentence would still be in play. Additionally, it is worth noting that the Third Circuit affirmed the
official victim enhancement on appeal. *See Duka*, 671 F.3d at 353.

Mr. Shnewer also argues that his sentence would have been lower than his life sentence if he pled because he would have expressed remorse as part of his acceptance of responsibility. However, as indicated above, Mr. Shnewer's acceptance of responsibility would have only reduced his guideline range by three points, which would have still placed him at the same advisory guideline range of life imprisonment. Furthermore, Mr. Shnewer's arguments that there was a reasonable probability he would have received less than a life sentence as expressed in this Claim does not particularly address this Court's analysis of the § 3553(a) factors. For example, among the factors that this Court discussed at Mr. Shnewer's sentencing, and which still would have been applicable had he pled, was this Court's statement that Mr. Shnewer was deeply committed to his violent radical beliefs and his desire to kill that could not be rehabilitated which warranted a within advisory guideline sentence of life imprisonment.

Mr. Shnewer next argues that he would have received a lesser sentence if he pled because this Court would not have been exposed to the "considerable amount of derogatory information" that was presented against him at trial. However, contrary to Mr. Shnewer's contentions, this Court certainly would have been presented with his offense conduct prior to this Court sentencing Mr. Shnewer if he pled in the Presentence Investigation Report. Furthermore, as noted by respondent and confirmed by Mr. Fitzpatrick in his declaration, the government had a firm stance in this case that it viewed life imprisonment as the only reasonable sentence against Mr. Shnewer and that it would advocate at sentencing for a custodial term of life. (*See* Dkt. No. 29 at p. 2-3) It thus follows that the government would then have provided the Court with all of the incriminating evidence against Mr. Shnewer in advocating for its recommended life sentence.

Mr. Shnewer also contends that his sentence would have been lower if he pled because "effective counsel would have adduced at the sentencing hearing examples of defendants who

pleaded guilty to similar conduct and received sentences of less than life in prison." (Dkt. No. 13 at p. 35-36) Mr. Shnewer relies on the cases discussed in Claim I in asserting that Mr. Cipparone should have brought them to this Court's attention. However, as this Court noted *supra* Part V.A, Mr. Cipparone was not ineffective for failing to bring these cases to the Court's attention because they were not applicable to show that a life sentence for Mr. Shnewer would cause an unwarranted sentencing disparity.

Finally, Mr. Shnewer asserts as follows:

> The fifth reason that Petitioner's sentence would likely have been lower had he received effective assistance at the plea bargaining stage is that effective counsel would have recognized that the government had charged him with a non-existent offense, thereby strengthening his bargaining position and increasing his chances for a sentence more lenient than the one he received after trial.

(Dkt. No. 13 at p. 36) As previously noted, Mr. Shnewer was improperly charged and convicted on Count 4, an error that was corrected during Mr. Shnewer's direct appeal. Nevertheless, Mr. Shnewer more specifically claims that:

> effective counsel at the plea negotiation stage would have acted to take the mischarged § 924(c) count off the table, thereby strengthening Petitioner's bargaining position and, it is reasonable to assume, resulting in a plea offer that, at the very least, would have had a reasonable probability of securing him a sentence of less than life in prison.

(Dkt. No. 13 at p. 38) Thus, as this Court interprets Mr. Shnewer's argument, had Count 4 been dismissed during the plea negotiations, then Mr. Cipparone would have been in a stronger position to negotiate with the government to obtain a lesser sentence because there would only be one count against Mr. Shnewer remaining. The problem with this argument is that it completely overlooks the government's position in this case with respect to a potential plea as espoused by Mr. Fitzpatrick in his declaration. Mr. Fitzpatrick makes clear that the government

would not have agreed to any plea agreement that did not allow the government to advocate for a life sentence. Thus, it is pure speculation on the part of Mr. Shnewer that had Count 4 been dismissed earlier against him, that the government would have offered a formal plea offer that would have reduced his sentence to something less than life imprisonment. Accordingly, he fails to make any showing whatsoever that a dismissal of Count 4 would have resulted in a particular formal plea offer other than the one discussed by the government, namely guilty on Count I, which, with the enhancements confirmed by the Third Circuit on direct appeal, would have kept Mr. Shnewer at a life imprisonment advisory guidelines range. Indeed, Mr. Fitzpatrick makes clear that he viewed life as the only reasonable sentence in this case and it was the government's position that it would not permit a plea offer that would not allow for the imposition of a life sentence. Therefore, Mr. Shnewer fails to show that he was prejudiced because he has not shown to a reasonable probability that he would have received a lesser sentence of life imprisonment had Mr. Cipparone pursued further plea discussions.

To sum up Claim III, Mr. Shnewer is not entitled to relief on his claim that Mr. Cipparone was ineffective by failing to disclose to him a plea offer since no formal plea offer was ever extended to him by the government. Furthermore, to the extent that Mr. Shnewer argues that Mr. Cipparone was ineffective for failing to pursue further plea negotiations, this Court finds that Mr. Shnewer is not entitled to relief on that claim because he fails to show that he was prejudiced. He has not shown to a reasonable probability that a particular plea offer would have been offered, what terms this hypothetical plea offer would have looked like and fails to show to a reasonable probability that he would have received a lesser sentence had Mr. Cipparone pursued further plea negotiations.

D. Claim IV – Other Co-Defendants' Claims

In Claim IV, Mr. Shnewer "wishes to join in the claims of his codefendant's § 2255 motions, and incorporates them by reference."[6] (Dkt. No. 1 at p. 5) The government takes exception to Mr. Shnewer's attempt to join in the claims raised by his co-defendants (the Duka brothers and Mr. Tatar) in their § 2255 motions because he does not plead them with specificity. (*See* Dkt. No. 10 at p. 24-27)

This Court need not deny this claim on the procedural grounds asserted by the respondent. Indeed, with the exception of one claim, all of the remaining claims brought by the Duka brothers and Mr. Tatar have now been denied by this Court. *See Tatar v. United States*, No. 13-3317, 2016 WL 589671 (D.N.J. Feb. 11, 2016); *Duka v. United States*, Nos. 13-3664, 13-3665, 13-3666, 2015 WL 5768786 (D.N.J. Sept. 30, 2015). Accordingly, Mr. Shnewer is not entitled to relief on those claims as well for the reasons discuss in those Opinions.[7]

The sole remaining claim with respect to the Duka brothers and Mr. Tatar in this case is the Duka brothers' claim that they did not voluntarily waive their right to testify at trial because their decision was the product of attorney coercion. *See Duka*, 2015 WL 5768786, at *4-6. The Duka brothers each submitted declarations in support of this claim and an evidentiary hearing was conducted on this claim on January 6, 2016. However, Mr. Shnewer does not allege in any

---

[6] Mr. Shnewer does not discuss this claim in his memorandum of law. However, as it is part of his habeas petition, the Court construes it as part of Mr. Shnewer's claims for relief.

[7] It is also worth noting that some of the claims raised by Mr. Shnewer's co-defendants appear to have little to no relevance to Mr. Shnewer's ability to obtain relief. By way of example only, Dritan Duka made a specific claim in his § 2255 motion that appellate counsel was ineffective for failing to argue on appeal that certain statements he made to Besnik Bakalli should have been admitted into evidence. *See Duka*, 2015 WL 5768786, at *21-25. It is unclear exactly how such a claim with respect only to Dritan Duka's guilt or innocence on the conspiracy conviction would have necessarily had an impact with respect to Mr. Shnewer's guilt or innocence. However, this claim by Dritan Duka was denied on the merits on September 30, 2015. *See Duka*, 2015 WL 5768786, at *21-25.

fashion whatsoever that his decision not to testify was the result of attorney coercion due to Mr. Cipparone stating to him that he was unprepared to have him testify. Therefore, this clearly distinguishes the Duka brothers' claims from Mr. Shnewer, who has made no showing (nor even argument) that he did not voluntarily waive his right to testify because it was the result of attorney coercion. Therefore, the fact that this Court conducted an evidentiary hearing on the Duka brothers' claim has no impact on Mr. Shnewer's § 2255 motion that makes no such allegations with respect to his right to testify. Accordingly, Mr. Shnewer is not entitled to relief on Claim IV.

## VI.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2255. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell,* 537 U.S. 322, 327 (2003). Applying this standard, the Court finds that a certificate of appealability shall not issue in this case.

## VII.    CONCLUSION

For the foregoing reasons, Mr. Shnewer is not entitled to relief on any of his claims set forth in his § 2255 motion. An appropriate order will be entered.

DATED: March  2, 2016                                    s/Robert B. Kugler
                                                        ROBERT B. KUGLER
                                                        United States District Judge